UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
IN RE NOVAGOLD RESOURCES INC.           :
SECURITIES LITIGATION                   :
---------------------------------------- :    08 Civ. 7041 (DLC)
                                        :
THIS DOCUMENT RELATES TO:               :
                                        :    OPINION AND ORDER
All Actions                             :
----------------------------------------X


Appearances:

For Lead Plaintiff New Orleans Employees' Retirement System:

Joseph A. Fonti
Benjamin D. Bianco
Labaton Sucharow LLP
140 Broadway
New York, NY 10005

For Defendants NovaGold Resources, Inc., Galore Creek Mining
Corporation, Rick Van Nieuwenhuyse, Robert J. MacDonald, Douglas
Brown, Peter Harris, George Brack, Michael H. Halvorson, Gerald
J. McConnell, Clynton R. Nauman, and James L. Philip:

Jack C. Auspitz
Jamie A. Levitt
Damion K. L. Stodola
Hilary M. Williams
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104

For Defendants Hatch Ltd. and Bruce Rustad:

Stephanie A. Nashban
Lewis Brisbois Bisgaard & Smith LLP
199 Water Street, 25th Floor
New York, NY 10038

For Defendants Citigroup Global Markets Inc., Citigroup Global
Markets Canada Inc., Cormark Securities Inc., MGI Securities
Inc., RBC Dominion Securities Inc., and Scotia Capital Inc.:

Scott A. Edelman

Thomas A. Arena
Richard E. Rosberger
Milbank, Tweed, Hadley & McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005

DENISE COTE, District Judge:

This action concerns an ambitious copper-gold mining project in a remote area of British Columbia, Canada undertaken by defendant NovaGold Resources, Inc. ("NovaGold"). NovaGold's decision to abandon the mining project because of spiraling capital costs, and the sharp decline in its stock price, have led to this putative securities class action lawsuit, which primarily challenges NovaGold's disclosures regarding the anticipated costs and risks of the mining project. This Opinion addresses the motions to dismiss that three separate groups of defendants have filed. As explained below, the defendants' motions to dismiss the claims filed under the Securities Act of 1933 (the "Securities Act"), are granted. As for the claims brought under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), only the claim against NovaGold survives.

BACKGROUND

The following allegations are taken from the corrected consolidated class action complaint (the "consolidated complaint") and the documents on which it relies. NovaGold was founded as a mineral exploration company, but shifted its focus

2

to mineral extraction and production in the late 1990s.  As part
of its foray into mineral extraction, NovaGold began
investigating the untapped mineral reserves of Galore Creek in
northern British Columbia in 2003, and acquired the mineral
rights to 215,000 acres.  Located in a mountainous area, the
untapped Galore Creek -- initially accessible only by helicopter
-- was believed to have large copper, silver, and gold deposits.[1]
The minerals were to be extracted through an "open pit" mine,
close to the surface, but spread out over a large area.

A. Scoping the Project: Engineering Challenges and the
   Preliminary Feasibility Study

      Considerable engineering challenges accompanied the
lucrative potential of the mine.  Because the Galore Creek site
was an open pit mine, extracting the minerals would require
excavating the waste rock sitting on top of the minerals first.
The excavated earth, which contained waste rock (the portion not
containing valuable minerals) and tailings (the material left
over from the process of separating the valuable minerals from
the worthless portion of the ore) needed to be stored
permanently elsewhere, usually in a structure known as a
"tailings dam."  NovaGold initially intended to place the
tailings dam in a valley where Galore Creek flowed, requiring

---

[1] The potential available mineral resources were reported to
amount to 6.8 billion pounds of copper, 5.95 million ounces of
gold, and 75.4 million ounces of silver.

the creek to be directed for 4.7 miles around the tailings dam area.  Heavy rains and snowfall in the winter of 2005-06 sharply increased the amount of surface water that NovaGold would need to divert.  The remote location and large size of the mine only amplified these logistical difficulties.

NovaGold undertook feasibility studies regarding the project in compliance with Canadian securities regulations imposing specific disclosure requirements on companies undertaking mineral exploration.  These requirements include preparation of "feasibility studies" by independent experts that include sufficient detail to enable a financial institution to determine whether it should finance the development of a project.  NovaGold retained defendant Hatch Ltd. ("Hatch") in 2003 to perform a preliminary study of the feasibility of the Galore Creek mine (the "Project").  Defendant Rick Van Nieuwenhuyse, NovaGold's CEO, announced the results of the preliminary study in October 2005, which included a capital cost estimate of US$ 1.1 billion (approximately 1.3 billion Canadian dollars ("C$")), indicating the commercial viability of the Project.  Hatch then began a final feasibility study, which was designed to estimate costs within 10-15% (the "Hatch Study").  NovaGold expected Hatch's study to be complete in the second half of 2006.  NovaGold subsequently raised US$ 165.3 million through an initial public offering ("IPO") on January 24, 2006.

A week later, it announced an agreement with the Native Canadian
Tahltan First Nation, which resided on portions of the Galore
Creek area (the "February 2006 Participation Agreement").  In
June 2006, NovaGold reported to Canadian authorities that it had
explored "all viable options" so that it could make a
"reasonable decision" about planning the Project.

B. Barrick's Hostile Takeover Bid and the Release of the Hatch
   Study

     NovaGold had earlier begun discussions with global mining
giant Barrick Gold Corp. ("Barrick") regarding a potential joint
venture to develop Galore Creek.  On July 24, 2006, Barrick
announced a hostile bid for NovaGold at US\$ 14.50 per share, and
NovaGold's share price increased from US\$ 11.67 to US\$ 16.17 the
following day.  NovaGold issued a press release on July 25
condemning Barrick's offer.  While attempting to fight off the
hostile bid, NovaGold also continued to learn more about the
surface water issues caused by heavy precipitation, which drove
up the costs of the Project further.  By October 2006,
NovaGold's share price declined to \$15.35, approaching the
\$14.50 offered by Barrick.

     NovaGold issued a press release on October 12 announcing
that the Hatch Study would likely be released by the end of the
quarter.  Barrick responded on October 24 by raising its offer
to US\$ 16 per share.  The next day, NovaGold announced the

release of the Hatch Study in a press release (the "October 25, 2006 Press Release"), entitled "Final Feasibility Study Completed at NovaGold's Galore Creek Project."  As described in the October 25, 2006 Press Release, the study confirmed the economic viability of the Project, stating that it was "one of the world's largest undeveloped copper-gold-silver projects with one of the lowest cash costs in the industry," and calculated capital costs at US$ 1.8 billion, or C$ 2.2 billion.  The October 25, 2006 Press Release also explained that the study's estimates reflected a +15%/-10% level of accuracy, and encompassed "all the direct and indirect costs and appropriate project estimating contingencies," including "construction of all major civil earthworks for the dams and water diversion structures."

Analysts responded to the Hatch Study enthusiastically and advised investors to reject Barrick's bid.  NovaGold announced in an October 31 press release that, because of the strong projections in the study, its negotiations with potential joint venture partners had accelerated.  It noted its recent "value-adding milestones," including the release of the "independent Galore Creek Feasibility Study, confirming economics of the project and providing the Company's first Proven and Probable Reserves."

The hostile takeover bid was overwhelmingly rejected on
November 8, 2006, and NovaGold announced the same in a press
release issued that day.  It attributed the shareholders'
rejection of the bid to "milestones," which included the
"[c]ompleted final Feasibility Study at Galore Creek."  NovaGold
also held a conference call on November 8 (the "November 8, 2006
Conference Call"), in which Van Nieuwenhuyse characterized the
Hatch Study as "done" and informed the public that NovaGold was
moving forward with construction:

> Final preparations are now being
> made . . . to basically take that
> feasibility study and implement that into a
> construction plan . . . having completed the
> feasibility study at Galore Creek, we can
> now speak about the reserves there.

Also participating in the call, defendant Robert J. MacDonald,
the CFO of NovaGold, described "significant interest from
potential joint venture partners," who had been awaiting "the
completion of our feasibility study, which was just released two
weeks ago."  MacDonald also repeated the Hatch Study's cost
figures: "based on the feasibility study . . . for Galore Creek,
we have a total capital of about [US]$ 1.8 billion."  Van
Nieuwenhuyse referred to the Project as "eminently financeable"
in a November 14 press release (the "November 14, 2006 Press
Release"), noting that "[w]ith the Feasibility Study for Galore
Creek now complete, NovaGold has been approached by a variety of

interested financial and industry partners . . . we are confident that Galore Creek is of significant interest to potential joint venture parties."

Another press release of December 5 (the "December 5, 2006 Press Release") urged investors to continue to reject Barrick's bid, with Van Nieuwenhuyse declaring that "we plan to build [the Galore Creek] project on time and on budget."  The press release also mentioned "the release of an independent Feasibility Study confirming Proven and Probable Reserves and the economics of the Galore Creek project."  NovaGold again touted the Hatch Study in a December 14 press release, noting cost estimates of "approximately US\$ 1.8 billion" to be incurred "between 2007 and 2010" and again stating that "[a] final Feasibility Study for the Galore Creek project, completed by Hatch Ltd. in October 2006, provided Proven and Probable Reserves for NovaGold and confirmed the economics and mine plan of the Galore Creek project."

C. Cost Increases and a Secondary Offering

Behind the scenes, plaintiff's confidential sources report that costs were spiraling upward and approached C\$ 3.7 billion by early summer 2007.  Without publicly disclosing its decision, NovaGold retained AMEC Americas Ltd. ("AMEC"), a competitor of

Hatch, to conduct a new feasibility study to re-estimate certain costs beginning in February or March 2007.

NovaGold's disclosures, meanwhile, continued to refer to the cost figures calculated in the Hatch Study.  On February 9 (the "February 2007 Report"), NovaGold issued a press release stating that "the Feasibility Study budget is sufficient for construction of the Project within current contingency allegations" and reiterating the cost figures from the Hatch Study.[2]  The February 2007 Report quoted defendant Peter W. Harris, Chief Operating Officer of NovaGold, who, after noting that a "Project Development Team has been reviewing the Feasibility Study capital costs," stated that "the team has determined that the Feasibility Study budget is sufficient for construction of the Galore Creek project within current contingency allocations.  This review will continue as basic and detailed project engineering proceeds."

The press release accompanying NovaGold's 2006 annual statement, released on February 28 ("the February 28, 2007 Press Release"), again "confirmed the economics and mine plan," of the

---

[2] The consolidated complaint appears to describe this document both as a "press release," and as "the February 20, 2007 Change Report, which was dated February 9, 2007."  It is possible that both a press release and a report were issued, but the consolidated complaint does not clarify whether this occurred, and the language of which the plaintiff complains appears to be drawn from the press release only.  Nonetheless, the document(s) will be referred to as "the February 2007 Report" throughout this Opinion.

Project, as well as the US$ 1.8 billion cost figure.  During a
March 2, 2007 conference call reviewing earnings for the fourth
quarter of 2006 (the "March 2, 2007 Conference Call"), MacDonald
reviewed the cost figures once again: "[y]ou see the total
capital for Galore Creek at approximately [US]$ 1.8 billion or
C$ 2.2 billion . . . just over four months ago, NovaGold
completed the feasibility study for Galore Creek."

D. The Secondary Offering

    On the advice of Citigroup, NovaGold sought to obtain
additional financing for the Project.  On April 18, NovaGold
commenced a secondary offering of 12.5 million shares of its
stock that raised US$ 194 million pursuant to an Amended
Registration Statement on Form F10/A, filed with the SEC on
April 16, 2007 (the "Registration Statement").  NovaGold also
issued a press release and its Form 6-K Quarterly report on
April 16.  The press release noted that the start-up of
operations at Galore Creek would be delayed from 2011 to 2012,
but that the construction would nonetheless require an
"unchanged overall construction budget of [C]$ 2.2 billion (US$
1.8 billion)."

    NovaGold then held an earnings conference call on April 25
(the "April 25, 2007 Conference Call"), where Van Nieuwenhuyse
commented that NovaGold was "driving down into the very low end

10

of the cash cost curve with production from Galore Creek."
MacDonald repeated the same cost and viability tropes: "[t]he
total project financing cost [for the Project] is about C$ 2
billion."

On May 23, NovaGold issued a joint press release with Teck
Cominco ("Teck") announcing their US$ 2 billion partnership to
develop Galore Creek, named "the Galore Creek Mining
Corporation" ("GCMC") (the "May 23, 2007 Press Release").  The
press release noted that "[s]ince the completion of the
Feasibility Study last fall, NovaGold has been preparing for the
start of construction."  NovaGold also disclosed that it planned
"an aggressive program of . . . technical studies. . .  aimed at
increasing the value of the Galore Creek project by optimizing
the additional approximately 1 billion tonne mineral resource in
the Galore Creek Valley that is not currently included in the
Galore Creek feasibility study."   In the meantime, construction
would "continue in accordance with NovaGold's previously
announced timelines and budgets to achieve production by mid-
2012."  Several analysts responded favorably to the joint
venture, viewing it as evidence of the value of the Project.  By
the fall of 2007, Teck had provided C$ 78 million of funding.

E. Cost Estimates Rise

In mid-2007, NovaGold began to experience cost overruns at another project, Rock Creek.  Analysts from MGI questioned management regarding whether the flawed estimates could impact the Project.  Satisfied that they would not, MGI issued a report in July stating that NovaGold had reviewed estimates with "their consultants" and "believe[d] that the numbers provided still stand."  A June 1 press release (the "June 1, 2007 Press Release") discussed further technical studies, but without any effect on the Project's budgets or timelines:

> Construction will proceed in accordance with
> NovaGold's previously announced budgets and
> timelines to achieve production by mid-2012,
> and the Galore Creek partnership will engage
> in exploration and technical studies aimed
> at increasing the value of the project by
> optimizing the additional resources that are
> not currently included in the Galore Creek
> Feasibility Study completed by Hatch Ltd. in
> October 2006.

A press release issued on July 16 reiterated that the Project would require an "investment of US\$ 2 billion."  A Form 6-K quarterly report filed that same day with the SEC (the "July 16, 2007 Quarterly Report") also confirmed that the budget described in the Hatch Study would remain "unchanged."

Taking analysts on a tour of the Project in August 2007, NovaGold described the AMEC study as a "scoping study" intended to measure a project's reserves, compared with capital costs.

Following the analyst visit, some analysts began to increase their own cost estimates for the Project.  On August 30, an analyst from defendant Cormark Securities Inc. ("Cormark") explained that he now believed capital costs on the Project to be higher than originally estimated, owing to currency fluctuations and the fact that Hatch's estimate did not account for cost inflation occurring during the construction period or a US$ 115 million power line that the Project required.  Cormark increased its capital expenditure assumption by approximately 25%, to US$ 2.3 billion.  NovaGold issued a press release on October 1 that hewed to the Hatch Study's cost figure, referencing only the "C$ 2.2 billion" "estimated construction costs" of the "October 2006 Feasibility Study."

F. Disclosures of Cost Increases

    NovaGold's first disclosure that costs were expected to exceed the Hatch Study's estimate, and that AMEC had been engaged to conduct a new feasibility study, came in a press release issued on October 15 ("October 15, 2007 Press Release").  The October 15, 2007 Press Release disclosed that

> Galore Creek Mining Corporation has engaged
> AMEC to prepare an updated feasibility study
> to, amongst other things, support the
> project financing of Galore Creek.  The
> updated feasibility study is expected to
> result in significant increases to capital
> costs resulting from, among other things,

13

> the inclusion of additional power line costs
> in connection with the higher-capacity line
> described below, and escalating local and
> worldwide constructions; further
> optimization of the project, including
> potential modifications to grind size and
> the significant strengthening of the
> Canadian dollar against the U.S. dollar.
> Capital cost increases are expected to be
> <u>partially offset by improvements in
> operating costs</u>.  The updated feasibility
> study is targeted to be complete in the
> first half of 2007, but revised costs for
> the project may be available earlier than
> that.

(Emphasis supplied).  NovaGold's Form 6-K quarterly earnings

report signed the same day (the "October 15, 2007 Quarterly

Report") repeated the statements above.  Following the press

release, the share price fell by forty-six cents, from US$ 19 to

US$ 18.54.  On a conference call two days later (the "October

17, 2007 Conference Call," Van Nieuwenhuyse again described the

AMEC study as an "updated" feasibility study.  A presentation to

the New Orleans Investment Conference delivered on October 23,

2007 (the "October 23, 2007 NOIC Presentation"), however,

referred twice to the Hatch Study when estimating Project costs,

without mentioning any "update."

Six weeks after it first disclosed that AMEC was updating

the Hatch Study, on November 26, 2007, NovaGold and Teck

announced that they were suspending the Project, whose capital

costs were now expected to approach US$ 4.4 billion (C$ 5

billion), a 144% increase from the original estimate.  A member

14

of the Tahltan Nation ("CW 3") learned that Teck insisted on the Project's suspension, while NovaGold had hoped to continue, despite the dramatic increase in the capital cost estimate.  The press release announcing the suspension, dated November 26, 2007, disclosed that NovaGold had retained AMEC in April 2007 to review the results of the Hatch Study, with a focus on the construction of the tailings and water management structures and mine facilities.  According to the press release, by October 2007, AMEC's preliminary findings

> indicated it expected capital costs would be significantly higher than originally estimated.  As a result, NovaGold and Teck Cominco commenced a project strategy review . . . to assess the AMEC work. Estimated costs have continued to increase during this review, and NovaGold and Teck Cominco now have sufficient information to indicate that the capital cost of the project could approach as much as [C]$5 billion.  The engineering review is ongoing.
>
> Although there have been changes in scope from the original feasibility study, <u>the largest portion of the capital cost increase is related to the complex sequencing of activities necessary to build the tailings dam and water management structures, and the resulting extension of the construction</u> by 18 to 24 months.  The project has also been affected by the rapidly escalating capital costs affecting major construction projects world-wide.
>
> In light of these developments, NovaGold and Teck Cominco have agreed to suspend construction . . .

(Emphasis supplied).  The day that the press release announcing the suspension was issued, NovaGold's share price fell 53% to US$ 10.76 on a trading volume of over 24 times the daily average during the class period.

G. The Lawsuit

Three prospective lead plaintiffs filed securities class action complaints against NovaGold, alleging that the company had deceptively concealed the true costs of the Project in violation of securities laws, seeking recovery on behalf of a class who had acquired NovaGold common stock between October 25, 2006, the day of the press release announcing the completion of the Hatch Study, and November 23, 2007 (the "Class Period"). The first complaint was filed on August 7, 2008 by Rudolph Textor, naming NovaGold, Van Nieuwenhuyse, MacDonald, and Harris as defendants and alleging violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j, 78t(a), and Rule 10b-5, the parallel regulation promulgated under Section 10(b), as well as Sections 11 (against all defendants except Harris) and 15 of the Securities Act (against Van Nieuwenhuyse and MacDonald only), 15 U.S.C. §§ 77k(a) and 77(o).

After a second plaintiff filed a complaint on September 9 against the same defendants, bringing Exchange Act claims only, an Order issued on September 15 scheduling a conference to

consider any motions to be appointed as lead plaintiff and for
consolidation.  Following the conference, held on October 31, an
Order of November 5 appointed the New Orleans Employees'
Retirement System ("NOERS") as Lead Plaintiff ("plaintiff"),
consolidated the actions, and required a consolidated complaint
to be filed by December 19, 2008.

NOERS then filed its own complaint on November 21.  To the
defendants already named in the previously filed actions, it
added the remainder of the defendants named below, including
NovaGold's directors, Hatch Ltd., and the companies who served
as underwriters of the April 18, 2007 secondary offering.  In
addition to the violations alleged by other plaintiffs,
plaintiff alleged that NovaGold and the underwriters had
violated Section 12(a)(2) of the Securities Act, 15 U.S.C. §
77l(a), and that the underwriters, NovaGold's directors, and
Hatch and its employee Bruce Rustad, had violated Section 11 of
the Securities Act, and that NovaGold officers Douglas Brown,
Carl Gagnier, Harris, Gregory S. Johnson, Joseph R. Piekenbrock,
Elaine M. Sanders, and Douglas Nicholson had violated Section 15
of the Securities Act.  The plaintiff's complaint did not
include Exchange Act claims.

Plaintiff filed the consolidated complaint on December 30, 2008, challenging NovaGold's disclosures regarding the Project.[3] It asserts causes of action under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5, as well as others under Sections 11, 12(a)(2) and 15 of the Securities Act.  In essence, the complaint alleges that NovaGold, fearing Barrick's hostile takeover bid, manipulated the results of the Hatch Study, and continued to rely on the estimates contained in the Hatch Study in public disclosures, including the Registration Statement, while concealing the true escalation in the costs of Galore Creek and the retention of AMEC to assess those costs.

In addition to NovaGold and GCMC, the consolidated complaint identifies several groups of defendants, including:

- NovaGold officers Van Nieuwenhuyse, MacDonald, Harris, and Brown, who was NovaGold's Vice President of Business Development at the time that the Registration Statement became effective and the General Manager of Galore Creek and President of GCMC beginning in May 2007;
- NovaGold Directors George Brack, Michael H. Halvorson, Gerald J. McConnell, Clynton R. Nauman, and James L. Philip, all of whom signed the Registration Statement (the "NovaGold Directors"; collectively with NovaGold and Galore Creek Mining Corporation, the "NovaGold Defendants");
- The underwriters of the secondary public offering, including Citigroup Global Markets Inc., Citigroup Global Markets Canada Inc., RBC, Scotia Capital Inc., Cormark, and MGI (the "Underwriter Defendants"); and

---

[3] Plaintiff filed a consolidated complaint on December 20, 2008. Plaintiff submitted a letter on December 22 requesting permission to file a corrected consolidated amended complaint.

-       Hatch and Rustad, an engineer working for Hatch who
        had primary responsibility for the Hatch Study, who
        consented to the Registration Statement making
        references to his name and involvement in the study
        (the "Hatch Defendants").

Allegations appearing for the first time in the consolidated

complaint include those asserting that NovaGold officer Brown

violated Sections 10(b) and 20(a) of the Exchange Act and Rule

10b-5 and that the NovaGold Directors violated Section 20(a) of

the Exchange Act.

On January 23, 2009, the Underwriter Defendants, the Hatch

Defendants, and the NovaGold Defendants each filed motions to

dismiss the consolidated complaint for failure to state a claim

on multiple grounds, pursuant to Rules 8(a), 9(b), 12(b)(1), and

12(b)(6) of the Federal Rules of Civil Procedure and the Private

Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-

4(b).  The Hatch Defendants also seek dismissal of the claims

against Rustad under Rules 12(b)(2) and (5), Fed. R. Civ. P.

This Opinion first addresses defendants' arguments that

plaintiff's Securities Act claims against the NovaGold

Directors, NovaGold officer Brown, the Underwriter Defendants,

and the Hatch Defendants are barred by the statute of

limitations before considering whether plaintiff has stated a

claim for relief under the Securities and Exchange Acts.

DISCUSSION

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citation omitted).  This rule "does not require 'detailed factual allegations,'" id. (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)), but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  Id. (quoting Twombly, 550 U.S. at 555); see also Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 555 U.S. at 557).

A court considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co., 517 F.3d 104 (2d Cir. 2008) (citation omitted).  To survive such a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 555 U.S. at 570).  This "plausibility standard

is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citation omitted).

The Supreme Court in Iqbal summarized the "[t]wo working principles that underlie" Twombly: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id. "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 1950. Applying this second principle "will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. Thus, the Supreme Court set out a "two-pronged" approach for courts deciding a motion to dismiss:

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. . . . When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id. A court may also consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" on a motion to dismiss. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted) ("ATSI").

21

A. Securities Act Claims

Each of the defendants named for the first time in the plaintiff's November 21, 2008 complaint has moved to dismiss the Securities Act claims pleaded against them in the consolidated complaint.[4]  Motions to dismiss a complaint on statute of limitations grounds are properly brought under Rule 12(b)(6), Fed. R. Civ. P.  McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004).  Such motions may be granted only "if the defense appears on the face of the complaint" and where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." Id. (citation omitted). See also Staehr v. Hartford Financial Svcs. Group, Inc., 547 F.3d 406, 412 (2d Cir. 2008)

Plaintiff's Securities Act claims assert violations of Sections 11, 12(a)(2), and 15 of the Act.  Section 11 of the Act provides that any signer, director of the issuer, preparing or certifying accountant, or underwriter may be liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to

---

[4] The Securities Act claims in the December 30, 2008 consolidated complaint are time-barred because it is undisputed that the November 26, 2007 announcement of the Project's suspension put plaintiffs on inquiry notice that the Registration Statement contained the false statements of which the plaintiff complains. The plaintiff therefore relies on its November 21, 2008 complaint to bring its Securities Act claims against these moving defendants within the one-year statute of limitations.

state a material fact required to be stated therein or necessary
to make the statements therein not misleading . . . ."  15
U.S.C. § 77k(a).  Section 12(a)(2) of the Securities Act allows
a purchaser of a security to bring a private action against a
seller that "offers or sells a security . . . by means of a
prospectus or oral communication, which includes an untrue
statement of a material fact or omits to state a material fact
necessary in order to make the statements . . . not misleading."
15 U.S.C. § 77l(a)(2).  Section 15 extends Securities Act
liability to "[e]very person who, by or through stock ownership,
agency, or otherwise ... controls any person liable under
[section 11] or [section 12] of this title," 15 U.S.C. § 77o.

Defendants argue that the October 15, 2007 Press Release,
in which NovaGold announced that it had engaged AMEC to
undertake a feasibility study of the Project and that
significant increases were expected in the Project's costs,
triggered the one-year limitations period applicable to the
Securities Act claims.  If they are correct, the limitations
period expired on October 15, 2008, over a month before
plaintiff first alleged that the Hatch Defendants, the NovaGold
Directors, Brown, and the Underwriter Defendants had violated
the Securities Act.

1. Statute of Limitations: the Duty of Inquiry

Claims brought under Sections 11, 12, and 15 of the Securities Act are subject to the one-year statute of limitations set out under Section 13 of the Securities Act.  See 15 U.S.C. § 77m; Dodds v. Cigna Securities, Inc., 12 F.3d 346, 359-50, 350 n.2 (2d Cir. 1993) (Section 15).  The limitations period begins to run when the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge."  Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir. 1992).  Put otherwise, "Section 13 imposes a duty of inquiry."  Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 701 (2d Cir. 1994).

The presence of the duty to inquire is evaluated according to an objective, totality-of-the-circumstances test examining "when the circumstances would suggest to an investor of ordinary intelligence the probability" that she has a cause of action. Staehr, 547 F.3d at 427 (citation omitted).  The circumstances giving rise to constructive notice and the duty to inquire are referred to as "storm warnings."  Id.  To trigger the duty of inquiry, the storm warnings must "relate directly" to the misrepresentations and omissions on which the plaintiffs base their claims, but they "need not detail every aspect" of the

alleged scheme.  Id. (citation omitted).  When the storm

warnings take the form of "company-specific information

probative" of the alleged wrongdoing, a duty to investigate

arises.  Id. at 428 (citation omitted).  But, storm warnings

exist only when the available information makes wrongdoing

"probable, not merely possible."  Shah, 435 F.3d 244, 249 (2d

Cir. 2006) (citation omitted).

    In some cases, despite the presence of storm warnings,

investors are not placed on inquiry notice "because the warning

signs are accompanied by reliable words of comfort from

management."  LC Capital Partners LP v. Frontier Ins. Group,

Inc., 318 F.3d 148, 155 (2d Cir. 2003).  While such statements

must be considered, their existence will prevent or dissipate

the duty to inquire "only if an investor of ordinary

intelligence would reasonably rely on the statements to allay

the investor's concern."  Id.  This depends "in large part on

how significant the company's disclosed problems are, how likely

they are of a recurring nature, and how substantial are the

'reassuring' steps announced to avoid their recurrence."  Id.


2. The Registration Statement's Alleged Misrepresentations

    The Securities Act claims arise from the Registration

Statement filed on April 16, 2007.  Plaintiff describes five

ways in which the Registration Statement was allegedly false and

misleading: 1) it did not disclose the true capital cost projections for Galore Creek; 2) it stated that the Project was economically viable; 3) it failed to disclose that proceeds from the offering would be used to fund a new feasibility study; 4) it characterized the Hatch Study as the "final" feasibility study; and 5) it failed to disclose that NovaGold had retained AMEC to conduct a new feasibility study.  When the Registration Statement is examined, it becomes clear that each of these misrepresentations or omissions arises from the statement's discussion of the Hatch Study.

After a general description of the Galore Creek Project, the Registration Statement proceeds to a section entitled "Feasibility Study."  In that section, it explains that in

> October 2006, Hatch Ltd., an independent
> engineering services company. . . completed
> a feasibility study (the 'Galore Creek
> Feasibility Study') for the Galore Creek
> project.  This study confirms the economic
> viability of a conventional open-pit mining
> operation using long-term metals
> prices. . . .  The information set out below
> is a summary of information contained in the
> Feasibility Study and is subject to
> important qualifications, assumptions and
> exclusions.

(Emphasis supplied).  The next page and a half of the Registration Statement sets out tables with financial information drawn from the Hatch Study, including a line item

for total capital costs, comprised of mine facility and infrastructure costs, which were listed as US$ 1.805 million.

In addition, among the items described in the fourteen-page Risk Factors section of the Registration Statement, NovaGold disclosed the possibility that the capital cost estimate might later be revised by a future feasibility study:

> [c]apital and operating costs, production
> and economic returns, and other estimates
> contained in the [Feasibility Study] or
> other feasibility studies or economic
> assessments, if prepared, may differ
> significantly from those anticipated by
> NovaGold's current studies and estimates,
> and there can be no assurance that the
> Company's actual capital and operating costs
> will not be higher than currently
> anticipated.

(Emphasis supplied).

The Registration Statement also incorporates "by reference" one other document on which the plaintiff relies: the February 2007 Report "announcing that the Galore Creek copper-gold-silver project in northwestern British Columbia is rapidly advancing toward the start of construction."[5]   The Registration Statement

---

[5] The consolidated complaint criticizes four additional documents incorporated by reference into the Registration Statement as "materially false and misleading," but fails to identify any language these documents contained or indicate that they used language similar to the allegedly misleading language contained in the February 2007 Report.  Allegations based on the Registration Statement's incorporation of these documents fail to give defendants fair notice of how they provide the grounds for a Securities Act claim.  They will accordingly be dismissed pursuant to Rule 8(a), Fed. R. Civ. P.  See Leibowitz v. Cornell

explains that this document and others have been filed with the
securities commission in Canada and are available through the
internet.  The February 2007 Report includes the following
description of the Project:

> A <u>final Feasibility Study</u> for the Galore
> Creek project, completed in October
> 2006, . . .  <u>confirmed the economics</u> . . .
> of the project. . . .  The Feasibility Study
> estimates that the <u>total capital cost</u> to
> develop the Galore Creek project <u>will be</u>
> <u>approximately US$ 1.8 billion</u>. . . .  The
> Feasibility Study was completed by Hatch
> Ltd. . . .

(Emphasis supplied).

    The first two misrepresentations of which the plaintiff
complains, which concern the capital cost projections and the
Project's economic viability, come directly from the
Registration Statement's (and the February 2007 Report's)
discussion of the Hatch Study.  Plaintiff's fourth and fifth

---

<u>Univ.</u>, 445 F.3d 586, 591 (2d Cir. 2006) (Rule 8 requires a
plaintiff to "give a defendant fair notice of what the claim is
and the grounds upon which it rests.").  In any event, the
consolidated complaint treats the language in the February 2007
Report as exemplary of the objectionable language in the other
documents incorporated by reference ("[f]or instance, the
[February 2007 Report] stated that the Hatch Study was the
'final' feasibility study").  Making inferences in the
plaintiff's favor by assuming that the plaintiff intended to
challenge these other documents on the same grounds on which it
challenges statements in the February 2007 Report, and that
allegations regarding additional incorporated documents
therefore meet the Rule 8(a) standard, such challenges would
consequently be time-barred in the same manner as challenges to
the February 2007 Report, because its objectionable language is
based on the Hatch Study.

allegations of misrepresentation also relate directly to the
Hatch Study as well as the retention of AMEC to undertake
another feasibility study.  These two allegations take issue
with the characterization in the February 2007 Report of the
Hatch Study as "final," and with the allusion in the Risk Factor
section of the Registration Statement to other feasibility
studies that might be prepared.  The plaintiffs assert that AMEC
had already been retained by NovaGold by March 2007 to prepare
another feasibility study.

    Plaintiff's remaining Securities Act allegation asserts
that the retention of AMEC rendered the "Use of Proceeds"
portion of the Registration Statement misleading.  The "Use of
Proceeds" section explained that the proceeds from the offering

> will be used to fund further exploration at,
> and initial construction of, the Galore
> Creek project, to fund general exploration
> and development on the Company's other
> projects and for general corporate purposes.

Plaintiff alleges that the "Use of Proceeds" section does not
describe any funding for an additional feasibility study, even
though AMEC's was already under way.

    In summary, each of plaintiff's Securities Act allegations
rests on the Registration Statement's description of the Hatch
Study or its failure to disclose the retention of AMEC to
prepare another feasibility study.  They derive from the Hatch
Study's cost estimates and conclusions regarding the viability

of the Project and its status as the sole and final feasibility
study.

3. The October 15, 2007 Press Release Triggers the Duty of
   Inquiry.

     In relevant part, the October 15, 2007 Press Release
disclosed that "Galore Creek Mining Corporation has engaged AMEC
to prepare an updated feasibility study to, amongst other
things, support the project financing of Galore Creek.  The
updated feasibility study is expected to result in significant
increases to capital costs."  This statement is "company-
specific information" that relates directly to the
misrepresentations alleged.  See Staehr, 547 F.3d at 428.  The
October 15, 2007 Press Release thus put plaintiff on inquiry
notice of the claims relating to the retention of AMEC,
including the Registration Statement's alleged failure to
disclose that proceeds from the offering would be used to fund a
new feasibility study; its characterization of the Hatch Study
as the "final" feasibility study that had "confirmed" the
economic viability of the Project; and its failure to disclose
that NovaGold had retained AMEC to conduct a new feasibility
study.  When plaintiff first sought to bring these claims
against the NovaGold Directors, Brown, the Hatch Defendants, and

30

the Underwriter Defendants over a year later, they were time-
barred.

Plaintiff argues that "nothing" in the October 15, 2007
Press Release is indicative of a securities fraud claim, that
the press release does not foreshadow the cost increases
relating to the tailings dam and water management structures
that were largely responsible for derailing the Project, that
the small correction in NovaGold's stock price following the
press release evinces a lack of inquiry notice, and that the
October 15, 2007 Press Release contained words of comfort
tempering the storm warnings.  Each argument fails.

Plaintiff's complaint and opposition brief repeatedly
advise that its Securities Act claims are not based on fraud,
and fraud is not a requirement of a Securities Act claim.  See
Rombach v. Chang, 355 F.3d 164, 170-71 (2d Cir. 2004)
(considering whether a particular Securities Act claim sounded
in fraud or negligence).  Rather, the simple presence of "an
untrue statement of a material statement" or an omission of "a
material fact required to be stated" to make the statement at
issue not misleading is sufficient for liability.  15 U.S.C. §
77k(a).  Accordingly, Section 13 of the Securities Act, its
statute of limitations provision, provides that the limitations
period expires "within one year after the discovery of the
untrue statement or the omission," and makes no mention of

31

fraud.  15 U.S.C. § 77m; In re WorldCom Securities Litigation, 496 F.3d 245, 249 (2d Cir. 2007).  A plaintiff is thus on inquiry notice when it learns of the probability of an earlier "untrue statement" or "omission," not when it learns a misstatement involved fraud.[6]

Plaintiff also attempts to characterize the October 15, 2007 Press Release as "vague and misleading" in its failure to suggest the "colossal underestimation" of costs required to complete the tailings dam and water management structures.  As explained above, the cost estimates and economic viability projection that plaintiff faults in the Registration Statement are expressly identified as the estimates and projection of the Hatch Study, which was specifically called into question by the October 15, 2007 Press Release.  This press release clearly discloses that the Hatch Study is under revision, and that the new feasibility study "is expected to result in significant increases to capital costs."  These disclosures triggered inquiry notice.  While it did not detail every line item in the

---

[6] Plaintiff commits the same error when it attempts to distinguish the October 15, 2007 Press Release from cases cited by defendants, arguing that the press release at issue here does not reach "the exacting level of detail needed to put a plaintiff on inquiry notice of fraud." (Emphasis supplied). Given the heightened pleading standard required for fraud claims, described elsewhere in this Opinion, it is reasonable to require that plaintiffs need more information before they may be charged with being on notice of a securities fraud claim than they need to bring a claim challenging an untrue statement.

Hatch Study that the AMEC study was calling into question, storm warnings "need not detail every aspect" of the alleged scheme. Staehr, 547 F.3d at 427.[7]

Plaintiff submits that the decline in NovaGold stock following the October 15, 2007 Press Release, which, at under fifty cents, was much smaller than the drop that occurred after the November 26 disclosure that the Project was being suspended, is "telling" evidence that investors were not, in fact, put on notice of misstatements by the October 15, 2007 Press Release. While courts have considered fluctuations in share price following a disclosure when determining the presence of inquiry notice in the securities fraud context, stock price is "typically not dispositive standing alone." Newman v. Warnaco Group, Inc., 335 F.3d 187, 195 (2d Cir. 2003).

In this case, the share price for NovaGold stock promptly fell US$ 0.46, from US$ 19 to US$ 18.54, following the October 15, 2007 Press Release. The plaintiff does not suggest that this drop was insignificant when compared to the stock's

---

[7] Moreover, recent Second Circuit precedent addressing whether a particular disclosure is vague or specific enough to trigger inquiry notice has focused on whether the disclosure at issue specifically identifies the company against which a plaintiff brings its claims. In Staehr, while noting that there is no "categorical rule that inquiry notice can only be triggered by public pronouncements containing company-specific information," 547 F.3d at 429, it proceeded to analyze the degree to which the public information concerned the defendant's practices. Id. at 429-30.

historical performance or when assessed against the control provided by the entire market's and the mining industry's stock price movements of that same day.  Instead, the plaintiff points to the even more dramatic collapse of the stock that followed the suspension of the Project six weeks later.  The issue is not, however, whether the October 15, 2007 Press Release adequately warned investors of the Project's suspension, but whether it placed them on inquiry notice that the Hatch Study's financial analysis of the Project was no longer reliable.  That, it did, and the stock price drop following the press release supports that finding.

Finally, plaintiff cannot point to words of comfort tempering the October 15, 2007 Press Release's questioning of the Hatch Study.  Plaintiff points to statements in the press release that suggested that construction was proceeding, but these do not impact or conceal the disclosure that the Hatch Study was being superseded.  As explained above, the Hatch Study is the basis of the Registration Statement's assurances concerning the economic viability of the Project.  The duty of inquiry having been triggered, plaintiff's Securities Act claims against Brown, the NovaGold Directors, the Hatch Defendants, and the Underwriter Defendants, all of which appeared for the first time in the November 21, 2008 complaint, are time-barred.

4. Securities Act Claims Against NovaGold and Three of Its

  Officers

     The remaining Securities Act allegations accuse NovaGold

and its officers Van Nieuwenhuyse, MacDonald, and Harris of

violating Section 11 of the Securities Act, assert a claim under

Section 12(a)(2) of the Securities Act against NovaGold only,

and charge the three officers with "control person" liability

under Section 15 of the Securities Act.  Defendants do not

challenge the timeliness of Securities Act claims brought

against these defendants, but seek dismissal on other grounds.

     First, the NovaGold Defendants assert that the heightened

pleading standard of Rule 9(b), Fed. R. Civ. P., applies to

plaintiff's Securities Act claims because, despite disclaimers

to the contrary, the claims actually sound in fraud, and fail to

state a claim under this standard.  Second, they assert that the

language of the Registration Statement is not actionable for

various reasons, including those contained in the Underwriter

Defendants' papers and incorporated by reference.

5. Applicable Pleading Standard

     As already noted, Sections 11 and 12(a)(2) of the

Securities Act impose liability for misrepresentations of

material fact in registration statements or prospectuses,

respectively.  To state a claim under either section, a

plaintiff need not plead scienter, reliance, or fraud.  Rombach, 355 F.3d at 169 n.4.  But the Second Circuit has determined that the wording of Federal Rule of Civil Procedure 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."  Id. at 171. Therefore, "the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud."  Id.  Thus, under Rombach, in determining which pleading standard applies to a securities cause of action, a court must look not to the statutory elements of the cause of action, but rather to the underlying conduct alleged.

The heightened pleading standard does not apply to the Securities Act claims here.  Plaintiff sets off its Securities Act claims in a separate section of the complaint, prefaced with the statement that they sound in "strict liability and negligence."  The Securities Act allegations also charge defendants with failing to make a reasonable and diligent investigation into the statements contained in the Registration Statement, conduct suggesting negligence, not fraud.

Moreover, the Securities Act claims do not delineate between the conduct of the Underwriter Defendants, the Hatch Defendants, and the NovaGold Defendants.  Each group of

36

defendants had different incentives in the secondary offering, and each served a different function.  The complaint could not uniformly plead fraudulent conduct against all defendants given these distinctions; more specific conduct would need to be alleged.

Defendants identify no controlling authority finding that Securities Act allegations, when plead entirely separately from Exchange Act allegations, and accompanied by a disclaimer explaining that they sound in negligence, in fact sound in fraud.  The Rombach court advised that "courts are not required to sift through allegations of fraud in search of some lesser included claim of strict liability," but no sifting is required in a situation such as this, where the claims are separately plead.  Rombach, 355 F.3d at 176 (citation omitted).

6. Allegations of False Statements

a. Legal Standard: PSLRA Safe Harbor and Bespeaks Caution

Defendants argue that the items in the Registration Statement which plaintiff claims violated the Securities Act are not actionable, principally because they are protected as forward-looking statements under the PSLRA safe harbor or bespeaks caution doctrine, or because they were not untrue statements of material fact.  The PSLRA defines a forward-looking statement, in relevant part, as

> **(A)** <u>a statement containing a projection</u> of
> revenues, income (including income loss),
> earnings (including earnings loss) per
> share, <u>capital expenditures</u>, dividends,
> capital structure, or other financial items;
> **(B)** a statement of the plans and objectives
> of management for future operations,
> including plans or objectives relating to
> the products or services of the issuer;
> **(C)** <u>a statement of future economic</u>
> <u>performance</u>, including any such statement
> contained in a discussion and analysis of
> financial condition by the management or in
> the results of operations included pursuant
> to the rules and regulations of the
> Commission . . .

15 U.S.C. § 77z-2(i) (emphasis supplied).[8]  The PSLRA safe-harbor

provision provides that an issuer, or a person acting on an

issuer's behalf, is not liable for a forward-looking statement

that contains an untrue statement of material fact or an

omission of material fact

> if and to the extent that (A) the forward-
> looking statement is (i) identified as a
> forward-looking statement, and is
> accompanied by meaningful cautionary
> statements identifying important factors
> that could cause actual results to differ
> materially from those in the forward-looking
> statement; or (ii) immaterial . . .

15 U.S.C. §§ 77z-2(a), (c)(1); <u>Rombach</u>, 355 F.3d at 173.  The

safe harbor does not apply to forward-looking statements if made

with "actual knowledge" that they are false or misleading.  15

U.S.C. § 77z-2(c)(1)(B).

---

[8] The identical safe harbor applies to the Exchange Act, and is
codified at 15 U.S.C. § 78u-5.

Similarly, the judicially created "bespeaks caution" doctrine also removes liability for statements accompanied by cautionary language, providing that "alleged misrepresentations in a stock offering are immaterial as a matter of law if it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering." Rombach, 355 F.3d at 173 (citation omitted).  If a disclosure contains cautionary language, the court does not look at the alleged misrepresentation in isolation, but considers the disclosure in its entirety "to determine whether a reasonable investor would have been misled," asking "whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." Id. (citation omitted).  Examined in context, the cautionary language must "warn[] of the specific contingency that lies at the heart of the alleged misrepresentation." P. Stolz Family Partnership L.P. v. Daum, 355 F.3d 92, 97 (2d Cir. 2004). See also Hunt v. Alliance N. Am. Gov't Income Trust, Inc., 159 F.3d 723, 729 (2d Cir. 1998) ("The cautionary language ... must relate directly to that by which plaintiffs claim to have been misled.").  In addition, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has

transpired." <u>Rombach</u>, 355 F.3d at 173; <u>see also</u> <u>P. Stolz</u>, 335 F.3d at 97 ("knowledge within the grasp of the [company] -- is a different matter"). "The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." <u>Rombach</u>, 355 F.3d at 173 (citation omitted).

   b. Legal Standard: Materiality

   If a part of a Registration Statement is not protected under the PSLRA safe harbor or because it bespeaks caution, it violates the Securities Act, as stated above, if it "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. §§ 77k(a); 77l(a)(2). The materiality of a misstatement is evaluated using the well-established standard articulated in <u>Basic Inc. v. Levinson</u>, 485 U.S. 224 (1988), which requires proof that there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." <u>Id.</u> at 231-32, (citation omitted). Put otherwise, "[t]he materiality of a misstatement depends on whether there is a substantial likelihood that a reasonable shareholder would

consider it important in deciding how to act." ECA, Local 134
IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553
F.3d 187, 197 (2d Cir. 2009) (citation omitted) ("ECA").  A
material fact can relate to past, existing or even prospective
events.  Sonesta Int'l Hotels Corp. v. Wellington Assoc., 483
F.2d 247, 251 (2d Cir. 1973).

     "Because materiality is a mixed question of law and fact,"
it is ordinarily inappropriate for resolution at the motion to
dismiss stage.  ECA, 553 F.3d at 197.  A complaint may be
dismissed because the alleged misstatements or omissions are
immaterial, however, if the "they are so obviously unimportant
to a reasonable investor that reasonable minds could not differ
on the question of their importance."  Id. (citation omitted).

          c. Disclosures Relating to the Project's Cost Estimate and
             Its Economic Viability

     The US$ 1.8 million cost estimate figure calculated in the
Hatch Study and the Hatch Study's assessment that the Project
was economically viable are forward-looking statements
accompanied by cautionary language, eligible for protection
under the PSLRA safe harbor.  At the time of the Secondary
Offering, years remained until Galore Creek was operational, and
a prediction about its ultimate costs, as well as whether the
costs would be offset by sufficient revenue to render the

Project economically viable, are "projection[s]" plainly satisfying the definition in the PSLRA.

Plaintiff unpersuasively depicts these statements as statements of present fact by arguing that NovaGold, at the time the statement was made, had already determined what the Project would cost.  Any projection or forward-looking statement necessarily has its basis in current conditions, but this does not change the fact that it uses those current conditions to make some kind of prediction about the future.  Plaintiff's argument is better understood as an assertion that NovaGold knew, based on present conditions, that the statements were false when made, and should not be protected by the PSLRA safe harbor.  This argument is addressed below.

Plaintiff also submits that the fact that the Hatch Study was a "bankable" study, designed to serve as the basis for investors to ascertain whether the Project could provide long-term returns, demonstrates that its conclusions were not forward-looking projections.  Investors routinely make investment decisions using forward-looking material, betting on future returns from investments.  That they do so does not render such information not forward looking.

The cost figure and economic viability prediction were also accompanied by cautionary language adequate to invoke the PSLRA

42

safe harbor and bespeaks caution doctrine.[9]  The Registration

Statement's "Cautionary Statement Regarding Forward-Looking

Statements" warns investors that the Registration Statement

> contain[s] <u>forward-looking statements</u> . . .
> <u>concerning</u> the Company's plans at the Galore
> Creek, Donlin Creek, Nome Operations and
> Ambler projects, production, <u>capital</u>,
> operating and cash flow <u>estimates</u> . . . .
> These statements relate to analyses and
> other information that are <u>based on</u>
> <u>forecasts</u> of future results, <u>estimates</u> of
> amounts not yet determinable and <u>assumptions</u>
> of management.

(Emphasis supplied).  The Registration Statement then included a

list of twenty-four separate risks.  The fifth item on the list

was "uncertainty of capital costs, operating costs, production

and economic returns."

In the Risk Factors section of the Registration Statement,

bold, italicized text noted that "[a]ctual capital costs,

operating costs, production and economic returns may differ

significantly from those NovaGold has anticipated and there are

no assurances that any future development activities will result

---

[9] Because the Registration Statement itself contains adequate
cautionary language, it is unnecessary to consider the even more
extensive risk disclosures in the Hatch Study.  The Registration
Statement instructed investors on how to retrieve the study over
the internet via the System for Electronic Document Access and
Retrieval, the official website that provides access to
information filed by public companies with the Canadian
securities authorities, and explained that the study contained a
complete description of the important "assumptions" and
"qualifications" which were only summarized in the Registration
Statement.

in profitable mining operations."  Underneath, the Registration
Statement disclosed that "[t]he capital costs to take the
Company's projects into production may be significantly higher
than anticipated.  None of the Company's mineral properties,
including the Galore Creek . . . project[has] an operating
history upon which the Company can base estimates of future
operating costs."  After noting that decisions to develop Galore
Creek and other properties would be based on feasibility
studies, the Registration Statement warned that "other
feasibility studies or economic assessments, if prepared, may
differ significantly from those anticipated by NovaGold's
current studies and estimates, and there can be no assurance
that the Company's actual capital and operating costs will not
be higher than currently anticipated."

     In the same section of the Registration Statement, under
the bold, italicized heading disclosing that "NovaGold has no
history of producing precious metals from its mineral
exploration properties and there can be no assurance that it
will successfully establish mining operations or profitably
produce precious metals," the statement added that

          NovaGold is subject to all of the risks
          associated with establishing new mining
          operations . . . including: the timing and
          cost, which can be considerable, of the
          construction of mining and processing
          facilities . . . .  The costs, timing and
          complexities of mine construction and

44

> development are increased by the remote
> location of the Company's mining properties.
> It is common in new mining operations to
> experience unexpected problems and delays
> during development, construction and mine
> start-up . . .  Accordingly, there are no
> assurances that the Company's activities
> will result in profitable mining operations
> <u>or that the Company will successfully
> establish mining operations</u> or profitably
> produce precious metals.

(Emphasis supplied).  Additionally, the "Summary Financial

Results" table, which includes the US$ 1.8 million cost figure,

lists the Project's expected costs based on a "base case" of

assumptions about metals prices, as well as "estimates of annual

production and cash costs."

These examples indicate that the cost figure and prediction

of the Project's economic viability were subject to risks

regarding capital costs, the very risks which ultimately

materialized.  <u>See</u>, <u>e.g.</u>, <u>Rombach</u>, 355 F.3d at 176 (caution that

there was "no assurance" that company could raise sufficient

capital for continued expansion bespoke caution); <u>Luce v.

Edelstein</u>, 802 F.2d 49, 56 (2d Cir. 1986) (representations

regarding potential cash and tax benefits of a partnership

protected by statement in offering memorandum that "[n]o

assurance [could] be given that these projections [would] be

realized").  The warnings appeared "prominently and

specifically" at the beginning of the Registration Statement and

then again, in partially bolded text in the Risk Factors

section.  See Olkey v. Hyperion 1999 Term Trust, 98 F.3d 2, 5
(2d Cir. 1996) (finding no liability where prospectus gave
"prominent and specific" warnings of "exactly the risk the
plaintiffs claim was not disclosed" so as to "bespeak caution").

Additionally, characterizing a cost figure as an
"estimate," as the Registration Statement did, is inherently
cautionary, as the word "estimate" connotes uncertainty.  Using
the language of the bespeaks caution doctrine, no reasonable
investor could review the Registration Statement and not
understand that its cost estimates and NovaGold's current view
that the Project was economically viable were subject to change.
When the Registration Statement was issued, mine production
start-up was still five years away, as the Registration
Statement noted.  Given the warnings regarding capital costs, it
would be unreasonable to demand that a cost estimate must hold
steady over a multi-year period requiring considerable amounts
of construction of a large mine in a remote location by a
company just getting its start in the mineral production
business.

Plaintiff argues that the cautionary language provided is
inadequate because it did not warn of the "specific" event that
came to pass, an increase in the construction of the tailing dam
and water management structures.  The Registration Statement
does warn of this risk at a higher level of generality, at the

46

level of capital costs.  This level of generality is sufficient
and addressed the "relevant risk directly," a risk of rising
capital costs.  See Halperin v. EBanker Usa.com, Inc., 295 F.3d
352, 360 (2d Cir. 2002).  The Registration Statement need not
predict all of the details of the contingency that came to pass.
Requiring it to do so would force companies warning of capital
cost risks to detail every single capital expenditure they
planned to make and their expected costs.  Such an approach
would be impractical.[10]

---

[10] The requirement that the language in the offering document
must warn of "the specific contingency that lies of the heart of
the alleged misrepresentation" is drawn from the P. Stolz case,
which cited to the Second Circuit's slightly different
characterization of the requirement in Hunt, 159 F.3d at 729,
that the cautionary language "must relate directly to that by
which the plaintiffs claim to have been misled." P. Stolz, 355
F.3d at 97.  The P. Stolz plaintiffs, who had purchased
membership interests in a company called "Smart World," alleged
that Smart World failed to disclose "that the investment bank it
had retained had failed to raise any money for the
company . . . , that the projections of sales and revenues it
was relying upon were totally without foundation, or that the
Company was essentially insolvent and was supporting itself
through continued sales of membership interests rather than from
revenues from ongoing business operations." Id.  Smart World
had orally represented that it had agreed to partner with an
investment bank to undertake an initial public offering to raise
$30 million.  Id.  The Second Circuit found that the non-
disclosures were forward-looking and were protected by
sufficient cautionary language, which also had the effect of
neutralizing the oral representation regarding the $30 million
offering.  Id. at 98.  Among other statements, the court
emphasized the following language in Smart World's disclosure:
"we may need additional capital, which we may not be able to
obtain . . . .  No assurance can be given, nor has any been
given, that any of the Financing transactions . . . will be
consummated." Id. at 98 (emphasis omitted).  It was sufficient

In addition to criticizing the cautionary language as too general, plaintiff also argues that the safe harbor and bespeaks caution doctrine should not apply because the defendants knew, at the time they disseminated the Registration Statement, that the Hatch Study -- and its predictions -- were false.  See 15 U.S.C. §§ 77z-2(c)(1).  The consolidated complaint and plaintiff's brief, as discussed above, go to great pains to allege that misstatements in the Registration Statement resulted from negligence, not fraud, and to disclaim any intention that the Securities Act claims sound in fraud.  Defendants by definition could not have been acting with negligence if they had actual knowledge that they were making false statements.  Actual knowledge is the basis for a mental state supporting an allegation of fraud that involves the heightened pleading standards of Rule 9(b).  See Rombach, 355 F.3d at 176 (where offering document contained sufficient cautionary language, "a negligence claim, if properly pleaded, would be defeated in any event by the bespeaks caution doctrine").  The consolidated complaint thus fails to allege that defendants made objectionable statements in the Registration Statement with

---

to speak in terms of "transactions" and "additional capital" to offset the promise of the $30 million initial public offering; Smart World did not need to reference that specific transaction. Adopting the rule that plaintiff suggests by requiring that cautionary language disclose a risk in perfect detail would be inconsistent with the outcome in P. Stolz.

knowledge of their falsity.  The statements regarding the cost
estimate and economic viability of the Project are therefore not
actionable.

7. Statements Concerning AMEC's Retention

Defendants argue that the "Use of Proceeds" statement is
not false or misleading because payment to AMEC, which plaintiff
alleges the "Use of Proceeds" provision concealed, is a payment
for a "general corporate purpose" authorized by the provision.
Item 504 of Regulation S-K requires a registration statement to
disclose only the "<u>principal purposes</u> for which the net proceeds
to the registrant from the securities to be offered are intended
to be used." 17 C.F.R. § 229.504 (emphasis supplied).
Additionally, "[d]etails of proposed expenditures need not be
given."  <u>Id.</u>  On its face, payment to a contractor appears to be
a "general corporate purpose."  Plaintiff's opposition presents
no argument regarding the veracity of the "Use of Proceeds"
provision, thereby conceding defendants' argument that the
"general corporate purposes" language contemplated payment of a
consultant and was not misleading.[11]

---

[11] Plaintiff also fails to respond to defendants' argument that
the securities laws did not require disclosure of AMEC's
retention because the decision to engage a consultant to provide
advice regarding the Project's costs is immaterial, given that
the uncertainty of the Project's costs was disclosed.

8. Finality of Hatch Study

Plaintiff's remaining Securities Act allegation takes issue with the characterization of the Hatch Study as "the 'final' feasibility study," arguing that such a characterization concealed the fact that a further feasibility study was under way.  Nowhere does the Registration Statement identify the Hatch Study as "the" final feasibility study; the only mention of its finality is in the February 2007 Report (which is incorporated by reference into the Registration Statement) where it is called "a" final feasibility study.  The February 2007 Report stated that "[a] final feasibility study for the Galore Creek project . . . confirmed the economics and mine plan of the project."  The distinction between the plaintiff's allegation and the actual language used in the February 2007 Report is significant, because the term "the" suggests that there is only one such study, whereas "a" final study contemplates the existence of others.[12]

---

[12] Canadian securities regulations indicate that a feasibility study is designated as "final," in contrast with a "preliminary" feasibility study, to denote that it may serve as the basis for a final decision by a financial institution regarding funding, because it is "comprehensive" and investigates the relevant issues "in sufficient detail."  National Instrument 43-101, Standards of Disclosure for Mineral Projects, B.C. Reg. 381/2005, s. 1.1 (Can.).  Again, no indication exists that a "final" feasibility study may not later be revised as conditions change.

Even were plaintiff to amend its complaint to allege that calling the Hatch Study "a final feasibility study" violated the Securities Act because NovaGold planned another feasibility study, that complaint would still fail to state a claim.  The Registration Statement itself discloses the prospect of preparation of other feasibility studies: "other feasibility studies . . . may differ significantly from those anticipated by NovaGold's current studies and estimates."  This statement contradicts an allegation that the Registration Statement misleadingly communicated that the Hatch Study would not be superseded.

Plaintiff has thus failed to state a claim for a violation of the Securities Act based on the Registration Statement's characterization of the Hatch Study as final.  As no alleged violations of the Securities Act have survived defendants' motions to dismiss, the motions to dismiss the Securities Act claims are granted in their entirety.[13]

B.   Exchange Act Claims

Still to consider are plaintiff's claims under Section 10 of the Exchange Act and Rule 10b-5, which are brought against

---

[13] The allegations of control person violations brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, must be dismissed as well.  Establishing control person liability requires a plaintiff to make a prima facie showing of a primary violation by the controlled person.  See ATSI, 493 F.3d at 108.

the NovaGold Defendants and GCMC.  Plaintiff alleges that the
NovaGold Defendants defrauded investors by making material
misrepresentations and omissions concerning Galore Creek.
Plaintiff also brings claims under Section 20(a) of the Exchange
Act against the NovaGold officers and directors named as
defendants in the consolidated complaint.  The core theory of
plaintiff's Exchange Act claims resembles its core theory under
the Securities Act: that NovaGold made false statements
regarding the finality of the Hatch Study, the economic
feasibility of the Project, and the Project's cost estimate.
After considering whether plaintiff has stated an Exchange Act
claim against NovaGold, the existence of a claim against the
NovaGold Officers and NovaGold Directors and GCMC will then be
addressed.

Plaintiff first argues that the NovaGold Defendants
deceived investors regarding the true costs of the Project and
made fraudulently optimistic statements in order to inflate
NovaGold's stock price to fend off Barrick's hostile takeover
bid in November 2006 (preserving the company's independence and
their own jobs) and to reduce the number of shares it needed to
issue in the secondary offering in April 2007, thereby
minimizing the offering's dilutive effect.  Absent a finding
that the NovaGold defendants had motive and opportunity to
commit fraud, plaintiff seeks to demonstrate that defendants, in

continuing to rely on the Hatch Study in their public statements, exhibited knowledge or reckless disregard of the truth regarding escalating costs at Galore Creek and the Hatch Study's finality.

1. Section 10(b)

Section 10(b) of the Exchange Act is designed to protect investors by serving as a "catchall provision" which creates a cause of action for manipulative practices by defendants acting in bad faith. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 206 (1976). Rule 10b-5, the parallel regulation, describes what constitutes a manipulative or deceptive device. 17 C.F.R. § 240.10b-5. To state a cause of action under Section 10(b) and Rule 10b-5 a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused injury to the plaintiff." ECA, 553 F.3d at 197 (citation omitted).

Pleading standards beyond those required by Rule 12(b)(6), Fed. R. Civ. P., apply to plaintiff's Exchange Act claims. "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent to deceive, manipulate, or defraud," or, in the alternative, recklessness. ECA, 553 F.3d at 198 (citation

omitted).  Section 10(b) claims therefore sound in fraud, and must satisfy the pleading requirements of Rule 9(b) and the PSLRA by "stating with particularity the circumstances constituting fraud."  Id. at 196.

Under Federal Rule of Civil Procedure 9(b), "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  The Rule requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006).

2. Scienter

"Malice, intent, knowledge, and other condition of mind of a person may be averred generally" under Fed. R. Civ. P. 9(b), but the PSLRA requires that a plaintiff plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," that is, with intent to deceive, manipulate or defraud.  15 U.S.C. § 78u-4(b)(2); ECA, 553 F.3d at 198.  The "strong inference" of scienter may be established by alleging either that defendants had both motive and opportunity to commit fraud, or that strong

circumstantial evidence of conscious misbehavior or recklessness exists.  Id.

In evaluating whether a plaintiff has plead facts giving rise to a strong inference of scienter, a court considers "all of the facts alleged, taken collectively," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, ---, 127 S.Ct. 2499, 2509 (2007), but must also "'take into account plausible opposing inferences.'" ATSI, 493 F.3d 87, 99 (2d Cir. 2007) (quoting Tellabs, 127 S.Ct. at 2500).  The inference of scienter must be "at least as compelling as any opposing inference of nonfraudulent intent."  ECA, 553 F.3d at 198 (citation omitted).

To show that a defendant had "motive and opportunity to defraud," a plaintiff must allege that the defendant "benefited in some concrete and personal way from the purported fraud." Id.  Motives generally possessed by officers and directors, "such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer [or director] compensation" are insufficiently concrete and personal to qualify as a motive supporting the inference of scienter. Id.; see also Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001) (corporate directors).  Motives to act in ways that actually benefit shareholders, such as charging excessive fees on a transaction to maximize profits, also do not ordinarily

constitute a motive to defraud the shareholders.  ECA, 553 F.3d at 200.

To prevail by showing "circumstantial evidence of conscious misbehavior or recklessness," where there is no showing of motive and opportunity, "the strength of the circumstantial allegations must be correspondingly greater."  Id. at 198-99 (citation omitted).  Conscious misbehavior "encompasses deliberate illegal behavior."  Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000).  Recklessness, meanwhile, requires "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  ECA, 553 F.3d at 198.  "An egregious refusal to see the obvious, or to investigate the doubtful" may also comprise reckless behavior.  Novak, 216 F.3d at 308 (citation omitted).  "Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."  Id.  Company officials "need not be clairvoyant" or "anticipate[]future events," however, and are only obligated to reveal "material facts reasonably available to them."  Id. at 309.

The Second Circuit has identified four types of allegations that may be sufficient to allege scienter.  In addition to allegations that the defendants "(1) benefited in a concrete and

personal way from the purported fraud," or "(2) engaged in
deliberately illegal behavior," they include allegations that
defendants "(3) knew facts or had access to information
suggesting that their public statements were not accurate; or
(4) failed to check information they had a duty to monitor."
ECA, 553 F.3d at 199 (citation omitted).

     If plaintiffs rely on allegations that the defendants had
access to facts contradicting their public statements,
plaintiffs must "specifically identify the reports or statements
containing this information."  Teamsters Local 445 Freight Div.
Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d Cir.
2008) (citation omitted) ("Teamsters").  A plaintiff may also
rely on confidential sources to satisfy the pleading
requirements of the PSLRA and Rule 9(b).  Novak, 216 F.3d at
314.  In such a situation, the confidential sources must be
"described in the complaint with sufficient particularity to
support the probability that a person in the position occupied
by the source would possess the information alleged."[14]  Id.

---

[14] Following the Tellabs decision, the Seventh Circuit has held
that allegations from confidential witnesses must be discounted,
because "[i]t is hard to see how information from anonymous
sources could be deemed 'compelling' or how we could take
account of plausible opposing inferences.  Perhaps these
confidential sources have axes to grind.  Perhaps they are
lying.  Perhaps they don't even exist."  Higginbotham v. Baxter
Int'l, Inc., 495 F.3d 753, 757 (7th Cir. 2007).  The Second
Circuit has not yet addressed the issue, and, absent its
guidance to the contrary, its precedent allowing the use of

3.  The Consolidated Complaint's Exchange Act Allegations

The consolidated complaint identifies two categories of allegedly material false statements.[15] They are statements that failed to disclose that (1) the Hatch Study was inaccurate when released and grew increasingly obsolete, as NovaGold's internal capital cost estimates for the Project were materially higher than the Hatch Study's estimate and ultimately exceeded US$ 4 billion, rendering the Project non-viable;[16] and (2) the Hatch Study was not "the" final feasibility study performed on Galore Creek, nor was it a "bankable" feasibility study.

a. Statements Regarding the Project's Costs and its Economic Viability

The Hatch Study was announced to the public in the October 25 Press Release, with its capital cost estimate for the Project of US$ 1.8 billion or C$ 2.2 billion.  The announcement indicated that the estimate had a 15% level of accuracy for cost increases and confirmed the economic viability of the Project.

confidential sources to demonstrate scienter will be followed here.

[15] The plaintiff asserts six different misleading aspects of the allegedly false statements.  The six aspects have been consolidated into two categories here for ease of analysis.

[16] While defendants point out that many of these statements related to costs are forward-looking, because the consolidated complaint alleges that NovaGold had actual knowledge that the statements were false when made, the PSLRA safe harbor and bespeaks caution doctrine would not apply.  15 U.S.C. § 77z-2(c)(1)(B) (PSLRA safe harbor); P. Stolz, 335 F.3d at 97 (bespeaks caution doctrine).

The study and its figures were described repeatedly in company disclosures and communications over the course of the following year, through the October 23, 2007 NOIC presentation, delivered just over a week after the October 15, 2007 Press Release announced AMEC's retention to prepare an updated feasibility study.[17]

The plaintiff has pleaded with sufficient particularity facts supporting an inference that NovaGold knew that the Hatch Study and its cost estimate of US$ 1.8 billion were unreliable and misleading shortly after release, if not at release, or that NovaGold was at least reckless in its public statements of reliance on the estimate.  Confidential informants, either from the Tahltan First Nation; the Coast Mountain Power Corporation, a power company purchased by NovaGold to supply the Project's power; or Tercon, a company hired by NovaGold to construct access roads to Galore Creek, describe NovaGold's internal cost estimates for the Project from early 2006 as running as high as C$ 2.7 billion.  By early 2007, the Project was running over budget, especially due to the costs of the tailings dam and water management.  By the summer of 2007, NovaGold construction managers were discussing costs approaching C$ 3.7 billion.  On November 26, 2007, NovaGold announced that capital costs were

---

[17] The alleged false statements appeared in the sections of the press releases, conference calls, quarterly reports, and the Registration Statement quoted in the Background section above.

expected to approach US$ 4.4 billion or C$ 5 billion.  This massive revision of the Hatch Study's estimates could not have occurred without NovaGold realizing in the course of the year following the announcement of the Hatch Study that its estimates were unreliable.  Despite such knowledge, NovaGold continued to tout the Hatch Study's figures throughout that year.

NovaGold makes two principal attacks on this conclusion. It argues that the confidential informants are unreliable, and that the plaintiff has failed to show a material internal change to its cost estimates that it was required to disclose some time before its October 15, 2007 Press Release revealed that the new feasibility study was expected to result in significant increases to capital costs.  NovaGold's witness-by-witness attacks on the confidential informants are unpersuasive and do not displace the extent to which the allegations, "taken collectively," support an inference of scienter based on knowledge or recklessness.  ECA, 553 F.3d at 198.  NovaGold is correct that the confidential informants largely fail to identify reports or documents that would have demonstrated the falsity of NovaGold's statements, but they are not required to do so.  Teamsters, 531 F.3d at 196, on which NovaGold relies, involved allegations of scienter based on the mere presence of raw data, without any showing that it had been digested into reports concluding that the asset at issue was under-performing.

Plaintiff here relies upon confidential sources, not data points, and those confidential sources attest to the presence of contrary knowledge regarding the Project's budget.  The confidential witnesses have described widespread knowledge at NovaGold that the Project was over budget and that the Hatch Study's figures were inaccurate.  As noted, their assertions are corroborated by the fact that the November 26, 2007 announcement projected capital costs that were more than twice the amount estimated by the Hatch Study just one year earlier.

Finally, defendants attack the plausibility of the inference of scienter by asking why Teck would have invested in a non-viable project; Barrick was willing to negotiate with NovaGold regarding a joint venture before launching a hostile takeover effort; and NovaGold continued to invest in the Project.  Barrick and Teck, however, could have accepted the Hatch Study and NovaGold's representations regarding the study.  Regarding NovaGold's continued investment, plaintiff points out that NovaGold had obtained additional sums from investors in the secondary offering and Teck, which it was able to use to finance the Project, rather than spending its own money.[18]

---

[18] On the October 17, 2007 Conference Call, MacDonald stated that Teck's initial contribution to the joint venture "covers 100% of the cash payments for Galore Creek from August 1, 2007 to well into 2008."

As defendants rightly point out, not every cost overrun or internal revision to an estimate is material, and defendants challenge the sufficiency of the allegations on this basis.  In light of NovaGold's prominent and repeated reliance on the Hatch Study and its cost estimates to lure investment, however, the plaintiff has adequately pleaded materiality.

First, defendants assert that a revision to the cost estimate was not material unless the Project's economic viability was jeopardized, which they assert occurred at the C$ 5 billion price point and was disclosed when NovaGold suspended the Project in November 2007.  The consolidated complaint alleges that the Project was non-viable when the cost increased to only C$ 3.2 billion, raising a question of fact regarding the viability threshold inappropriate for resolution at this stage of the litigation.  In any event, while defendants may prevail at trial on their arguments concerning materiality, defendants' conception of materiality is too limited at the pleading stage. See Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000) ("At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions") (citing Basic, 485 U.S. at 431).  Applying the test from Basic, plaintiff has adequately alleged that a reasonable investor would want to know

62

whether the Project costs were escalating, as described in its pleading, beyond those estimated in the Hatch Study.[19]

The SEC's guidance in Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (1999) ("SAB 99"), regarding the determination of materiality, which the Second Circuit considers to be persuasive authority, ECA, 553 F.3d at 197, supports a finding that materiality has been adequately pleaded.  SAB 99 requires consideration of both quantitative and qualitative factors.  Id. Quantitatively, SAB 99 observes that misstatements of less than 5% (with respect to the specified item) are prima facie unlikely to be material.  SAB 99 at 45151.  Qualitative factors "that may well render material a quantitatively small misstatement of a financial statement item" include, inter alia, "whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate" as well as "whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or

---

[19]   Defendants attempt to analogize to drug testing, where the Second Circuit has ruled that a drug company did not need to report isolated deaths from its drug until they occurred in statistically significant numbers, threatening the product's commercial viability.  In re Carter-Wallace, Inc. Securities Litigation, 150 F.3d 153, 157 (2d Cir. 1998).  Here, the plaintiff has adequately alleged a concealment of significant financial information.

profitability."   <u>Id.</u>   While the misstatement alleged here
"arises from an estimate," the error was allegedly of large
magnitude, and it concerned a venture highly significant to
NovaGold, as evinced in part by analysts' positive comments
following the release of the Hatch Study.

Defendants further attack the extent to which failure to
disclose a cost estimate is a material omission by arguing that
forecasts need not be disclosed even if they render previously
issued forward-looking statements incorrect.   They rely on two
decisions of district courts in this Circuit, <u>In re New York</u>
<u>Community Bancorp, Inc., Securities Litigation</u>, 448 F. Supp. 2d
466, 480-81 (E.D.N.Y. 2006), and <u>In re Duane Reade Inc.</u>
<u>Securities Litigation</u>, No. 02 Civ. 6478 (NRB), 2003 WL 22801416,
at *7 (S.D.N.Y. Nov. 25, 2003), to argue that NovaGold had no
duty to disclose internal forecasts.

"Statements that are opinions or predictions are not <u>per se</u>
inactionable under the securities laws."   <u>In re International</u>
<u>Business Machines Corporate Securities Litigation</u>, 163 F.3d 102,
107 (2d Cir. 1998) ("<u>In re IBM</u>").   Having chosen to speak out
publicly regarding the Project's cost estimates, NovaGold was
under a duty to "speak truthfully about material issues," <u>Caiola</u>
<u>v. Citibank, N.A., New York</u>, 295 F.3d 312, 331 (2d Cir. 2002),
and to correct misleading statements, regardless of whether or
not they were "forecasts."   The duty to correct applies to

statements that are false at the time they are made, and it arises "when [the defendant] learned that its prior statement ... was untrue." Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 154 (2d Cir. 2007) (citation omitted). Cf. In re IBM, 163 F.3d at 109 (duty to correct does not arise if the original statements were not misleading when made). In contrast, the more limited duty to update applies to "a statement made misleading by intervening events, even if the statement was true when made." Overton v. Todman and Co., 478 F.3d 479, 487 (2d Cir. 2007).[20]  NovaGold's role in the Hatch Study and adoption of its figures further saddled the company with a duty to correct material errors in the Hatch Study. Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 (2d Cir. 1980) ("a company may so involve itself in the preparation of reports and projections by outsiders as to assume a duty to correct material errors in those projections").

Finally, defendants argue that the alleged misstatements are immaterial expressions of optimism about the Project and the Hatch Study.  Simple "expressions of puffery and corporate optimism" do not violate securities laws, as companies "are not required to take a gloomy, fearful or defeatist view of the

---

[20] While the PSLRA safe harbor suggests that a duty to update would not apply to some forecasts, the safe harbor is not an obstacle to imposing the duty to update here, as NovaGold continued to refer to the Hatch Study despite mounting evidence that the Hatch Study was materially obsolete.

future." Rombach, 355 F.3d at 174.  Statements classified as
puffery are expressions of optimism "too general to cause a
reasonable investor to rely on them."  ECA, 553 F.3d at 206.
Cost estimates, a forecast that the Project will be commercially
viable, or a comment that the Project's budget and construction
schedule are unchanged are too specific to be considered mere
puffery.[21]  The three Second Circuit decisions on which the
defendants rely all involved general expressions of optimism and
are thus inapposite.  See In re IBM, 163 F.3d at 108 ("company
was not concerned about being able to cover the dividend" was
"too indefinite to be actionable"); San Leandro Emergency
Medical Group Profit Sharing Plan v. Philip Morris Companies,
Inc., 75 F.3d 801, 811 (2d Cir. 1996) (Philip Morris was
'optimistic' about its earnings and 'expected' Marlboro to
perform well"); Lasker v. New York State Electric and Gas Corp.,
85 F.3d 55, 59 (2d Cir. 1996) ("strategies [that] lead to
continued prosperity" and "commitment to create earnings
opportunities").

---

[21] Stating that the Project would be commercially viable is not
the same as generally touting a company's optimistic outlook.
The commercial viability determination is the result of a
cost/revenue analysis that may be assessed using quantitative
data.

   b. Finality of Hatch Study and Existence of AMEC Feasibility
      Study

   This second category of misrepresentations includes

allegations that from October 25, 2006 until May 23, 2007 the

defendants portrayed the Hatch Study as "the" final feasibility

study and represented the feasibility study process as complete,

while secretly retaining AMEC to conduct a new feasibility

study, using proceeds from the secondary offering in an

unauthorized manner.  It also includes the disclosures in the

October 15, 2007 Press Release and October 17, 2007 Conference

Call that AMEC was retained to conduct an "updated" feasibility

study, rather than a "new" feasibility study, the omission of

any mention of AMEC in the October 23, 2007 NOIC Presentation,

and NovaGold's failure to disclose that AMEC had been retained

by March 2007 at the latest.  The plaintiff has failed to plead

that these statements were false or if false were made with the

requisite scienter.

   The problems plaguing plaintiff's attack on the

Registration Statement's alleged representation of the Hatch

Study as "the" final feasibility study similarly plague its

Exchange Act claims regarding the finality of the Hatch Study

and the retention of AMEC.  The disclosures that form the basis

of the Exchange Act claim do not describe the Hatch Study as

"the" final feasibility study, only "a" final study.  In

addition, the Registration Statement discloses the possibility
of "other" feasibility studies, and the February 2007 Report and
May 23, 2007 Press Release both state that various forms of
reviews were ongoing.  For example, the February 2007 Report
disclosed that review of the Project budget "will continue as
basic and detailed project engineering proceeds."

Finally, the consolidated complaint alleges that NovaGold
omitted to disclose on two occasions that proceeds were being
used to fund AMEC's engagement.  In addition to the "Use of
Proceeds" section in the Registration Statement, which was
discussed above in connection with the Securities Act claims,
the consolidated complaint alleges that, on April 24, 2007,
"NovaGold reiterated that it intended to use the proceeds of its
secondary offering to, inter alia,  . . . fund further
exploration at . . . the Galore Creek project."

The source of the latter statement is unclear.  If an oral,
contemporaneous statement, it may not be used to contradict the
"Use of Proceeds" provision in the Registration Statement.  See
Olkey, 98 F.3d at 9.  Regardless, the allegation that proceeds
would be used for exploration at Galore Creek, among other uses
("inter alia"), does not mean that proceeds could not also be
used for a feasibility study.  Additionally, it is unclear why a
feasibility study would not be part of the exploration process.

The disclosures' failure to name AMEC as the author of a
new study is similarly insufficient to render the omission
material.  As already described, NovaGold disclosed that reviews
were ongoing.  The plaintiff has not pleaded sufficient facts to
give fair notice that the retention of AMEC, as opposed to
different outside consultants or NovaGold employees, was
material.  Plaintiff's opposition brief fails to argue that the
omission of AMEC from the disclosures constituted a violation of
the Exchange Act, essentially abandoning claims based on AMEC's
retention.

9. Exchange Act Claims Against NovaGold Officers, Directors, and
   GCMC

Having found that the consolidated complaint states a claim
for relief under the Exchange Act against NovaGold to the extent
that it alleges that it made knowingly or recklessly false
statements regarding the Hatch Study's accuracy (but not its
finality), it is necessary to determine whether the consolidated
complaint states a Section 10(b) claim for relief against GCMC,
the NovaGold Directors, or any of the four NovaGold Officers it
names -- CEO Van Nieuwenhuyse, CFO MacDonald, COO Harris, and
Brown, the Vice President of Business Development and General
Manager of Galore Creek.

A plaintiff must plead scienter for each defendant.  See
Ganino, 228 F.3d at 168.  It is possible to plead scienter
against a corporation "without being able to name the
individuals who concocted and disseminated the fraud."
Teamsters, 531 F.3d at 195 (citation omitted).  Here, the
plaintiff has failed to plead scienter with respect to any
defendant but NovaGold.

Defendants assert -- and plaintiff does not contest -- that
the complaint lacks any allegations of scienter against the
NovaGold Directors or GCMC.  It also fails to identify any
misrepresentation uttered by Brown.[22]  While Van Nieuwenhuyse,
Harris, and MacDonald each made statements alleged to be false,[23]

---

[22] Brown joined NovaGold in 2007, and the consolidated complaint
makes no mention of any role he played in the events at issue
other than reciting his title.

[23] The consolidated complaint attributes statements regarding the
costs and economic viability of the Project in the October 25,
2006 Press Release, the November 8, 2006 Conference Call, the
November 14, 2006 Press Release, the December 5, 2006 Press
Release, the April 25, 2007 Conference Call, and the October 17,
2007 Conference Call to Van Nieuwenhuyse.  It also alleges that
Van Nieuwenhuyse and the NovaGold Directors signed the
Registration Statement.  MacDonald allegedly reiterated the
Hatch Study's cost estimate on the November 8, 2006, March 2,
2007, and April 25, 2007 Conference Calls.  Van Nieuwenhuyse and
MacDonald also both allegedly certified the July 16, 2007 and
October 15, 2007 Quarterly Reports, which reiterated the Hatch
Study's budget for the Project.  Only one comment is attributed
to Harris: the statement in the February 2007 Report that a
"Project Development Team has been reviewing the Feasibility
Study capital costs" and "determined that the Feasibility Study
budget is sufficient for construction of the Galore Creek
project within current contingency allocations," noting that

none of the confidential sources whose comments supported the
finding of corporate scienter allege that these three
individuals were aware of the falsity of the representations
they were disseminating.  With respect to scienter, the
plaintiff does not even argue in its brief that Van
Nieuwenhuyse, MacDonald, Harris and Brown specifically acted
with scienter, instead presenting its arguments against the
"Exchange Act defendants," which include NovaGold, collectively.
The plaintiff attempts to impute an inference of scienter to
each defendant by virtue of the fact that the alleged fraud
concerned "core" business operations, see In re Atlas Air
Worldwide Holding, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004), but
the Second Circuit has not endorsed this theory.  The plaintiff
fails to plead any motive and opportunity to defraud particular
to the NovaGold Officers.[24]

---

"review will continue as basic and detailed project engineering
proceeds."

[24] With respect to the allegations that the defendants sought to
fend off Barrick's takeover bid by inflating NovaGold's stock
price, plaintiff pleads and argues that the NovaGold Defendants
generally had this motive.  Such a motive, when ascribed to
individual employees, could be understood as the desire to
preserve one's career and compensation, but these are too
general to support an inference of scienter.  Kalnit, 264 F.3d
139.   Plaintiff introduces a new theory in its opposition brief
-- which it again argues generally against all NovaGold
defendants -- that the defendants  wanted to keep the stock
price high to minimize the dilution of NovaGold's stock price in
the secondary offering, relying on In re Time Warner Inc.
Securities Litigation, 9 F.3d 259, 269-70 (2d Cir. 1993) ("Time
Warner").  Plaintiff has not pleaded avoidance of dilution and

While the consolidated complaint has failed to plead scienter with respect to the NovaGold Officers, it suggests a basis for such allegations against Van Nieuwenhuyse and MacDonald premised on their duty to speak truthfully and Van Nieuwenhuyse's certification of the Registration Statement and their joint certification of two separate quarterly reports in 2007 containing the alleged misrepresentations.  Plaintiff will thus be given leave to replead scienter for Van Nieuwenhuyse and MacDonald.[25]

The defendants have also moved to dismiss claims for "control person" violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), solely because plaintiff has not alleged any primary violation of the Exchange Act.  Because an

---

not sought leave to amend its complaint to allege such a theory. As the consolidated complaint does not plead scienter on this basis, a motive to avoid the dilution of NovaGold's stock price need not be addressed here.  Even were the court to consider such a motive, however, it would fail to establish scienter, as any company issuing new shares of stock could be deemed to be acting with scienter.  Moreover, Time Warner involved not only a new stock offering that "substantially diluted the rights of existing shareholders," id. at 262, but also an offering that followed unsuccessful efforts to find strategic partners who would infuse the debt-laden company with cash.  See Rothman v. Gregor, 220 F.3d 81, 93 (2d Cir. 2000) (explaining the Time Warner holding as "in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter").  Finally, the opposition brief does not tie the desire to avoid dilution of the stock to each of the NovaGold Officers, again ascribing a general corporate motive to individuals.

[25] Plaintiff's opposition brief includes a general request for leave to amend.

Exchange Act claim against NovaGold survives, defendants' motion to dismiss control person violations brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), is denied.

C. Scope of the Class

Defendants also argue pursuant to Rule 12(b)(1), Fed. R. Civ. P., that there is no subject matter jurisdiction over putative class members who reside abroad and purchased their shares on the Toronto Stock Exchange.  The Securities Act claims having been dismissed, this issue will be addressed with regard to Exchange Act claims.

Congress determines the subject-matter jurisdiction of lower federal courts, and a plaintiff bears the burden of proving its existence.  Morrison v. National Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted).  As the securities laws are silent regarding their extraterritorial application, courts have long used use their "underlying purpose" to discern congressional intent regarding the use of "the precious resources of the United States courts and law enforcement agencies" to police securities transactions.  Id. (citation omitted).  The Court of Appeals has often concluded that "Congress would have wanted to redress harms perpetrated abroad which have a substantial impact on investors or markets within the United States."  Id. at 171 (citation omitted).

Courts employ a binary inquiry to determine the existence of subject-matter jurisdiction over securities law claims with an international component, known as the "conduct test" and the "effects test," which ask "(1) whether the wrongful conduct occurred in the United States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens." Id.  The two parts of the test may be applied together, although a party may also rely on one prong alone.  See id.

Here, plaintiff avails itself of the conduct test.  The conduct test allows for subject-matter jurisdiction "if activities in this country were more than merely preparatory to a fraud and culpable acts or omissions occurring here directly caused losses to investors abroad." Id.  Assessing whether American acts directly caused losses abroad requires courts to identify the actions constituting the fraud and then determine whether those actions "emanated from the United States." Id. at 173.

Plaintiff has not carried its burden on the issue of subject-matter jurisdiction.  This issue presents an example of what the Second Circuit recently referred to as a "foreign-cubed" securities class action, at least regarding the segment of the putative class at issue here.  Id. at 172.  The plaintiffs in this segment of the class are foreign and they

74

bring a lawsuit against a foreign issuer, based on their purchase of securities in a foreign country.  See id.  The fraud was concocted and conducted in Canada, at NovaGold's headquarters and at Galore Creek, both of which are located in British Columbia.  The financial information at issue was derived from Canadian activities and analyzed there, by both Hatch, another Canadian company, and NovaGold, and formed the basis for reports issued from Canada.

To establish jurisdiction under the conducts test, plaintiff cites the use of Citigroup, a New York-based investment bank, to be the lead underwriter on the secondary offering; the October 23, 2007 NOIC Presentation, which occurred in New Orleans; investment banks' reporting on NovaGold in the United States, NovaGold's dissemination of SEC filings, and press releases in the United States, and conference calls with participants from the United States.  The plaintiff also notes that up to 75% of NovaGold's trading volume occurred on the American Stock Exchange (the "AMEX"), and that NovaGold's share price declined on both the AMEX and the Toronto Stock Exchange following the disclosure of the Project's suspension.

None of plaintiff's allegations satisfy the conducts test.  The location of an underwriter is insufficient conduct to support jurisdiction.  See, e.g., Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 979-80, 987 (2d Cir. 1975).  The interest of

American analysts, and the purchase of NovaGold shares on the AMEX also are not part of the fraud alleged.  The only allegedly culpable conduct occurring in the United States was the dissemination of disclosures, including SEC filings. The disclosures, however, "emanated" from Canada.  Morrison, 547 F.3d at 173.  NovaGold has not alleged that the disclosures were concocted in the United States.  See id. at 174; see also SEC v. Berger, 322 F.3d 187, 194 (2d Cir. 2003) (subject matter jurisdiction existed where the "fraudulent scheme was masterminded and implemented by Berger in the United States"). Morrison declined to find subject matter jurisdiction arising from an Australian company's public statements, largely because "[e]nsuring the accuracy of such statements is much more central to the responsibilities of . . . corporate headquarters, which issued the statements."  Morrison, 547 F.3d at 176.  Plaintiff having not alleged otherwise, NovaGold's Canadian headquarters similarly bore responsibility for the company's public statements and disclosures, and such statements thus emanated from Canada, not the United States.

While SEC filings constitute U.S. conduct, Berger, 322 F.3d at 195 (citation omitted), filing documents with the SEC alone is insufficient to confer subject-matter jurisdiction.  See Itoba, 54 F.3d at 123-24.  Moreover, a foreign plaintiff would struggle to show that those filings "directly caused" the losses

76

they suffered.  Berger, 322 F.3d at 193 (citation omitted).  The
same problem would plague any attempt to pin subject-matter
jurisdiction on the October 23, 2007 NOIC Presentation in New
Orleans.  The lack of culpable conduct occurring in the United
States and the pleading's failure to tie foreign losses
"directly" to that conduct militate against the exercise of
subject-matter jurisdiction over the claims of foreigners
purchasing shares abroad.

Plaintiff also requests leave to amend to allege sufficient
jurisdictional facts following discovery of NovaGold's conduct
in the United States.  As plaintiff has failed to establish a
prima facie case favoring the exercise of jurisdiction over
foreign plaintiffs purchasing shares abroad, plaintiff's request
for jurisdictional discovery is denied.  In re Terrorist Attacks
on September 11, 2001, 538 F.3d 71, 96 (2d Cir. 2008).  Should
facts emerge during fact discovery on plaintiff's claims
suggesting the existence of subject-matter jurisdiction over
foreign plaintiffs who purchased shares abroad, any decision on
class certification could be altered to include those
plaintiffs.  See Boucher v. Syracuse University, 164 F.3d 113,
118 (2d Cir. 1999)("courts are required to reassess their
rulings as the case develops," and "must define, redefine,
subclass, and decertify as appropriate in the progression of the
case from assertion to facts") (citation omitted).

CONCLUSION

The Underwriter Defendants' and the Hatch Defendants' January 23, 2009 motions to dismiss are granted, and all claims against those defendants are dismissed.  The NovaGold Defendants' motion to dismiss of the same date is granted with respect to the consolidated complaint's Securities Act claims and Exchange Act Section 10(b) claims brought against the NovaGold Officers, the NovaGold Directors, and GCMC, as well as Exchange Act claims against NovaGold that are premised on allegations regarding the finality of the Hatch Study, the use of proceeds from the secondary offering, and the retention of AMEC.  Plaintiff is granted leave to replead an Exchange Act Section 10(b) claim based on false statements regarding the Hatch Study's cost estimates and endorsement of the Project's economic viability against defendants Van Nieuwenhuyse and MacDonald.  Defendants' motion to dismiss the claims of putative class members who reside abroad and who purchased their shares on the Toronto Stock Exchange is also granted.  The motion to dismiss the claim that NovaGold misrepresented the Project's cost estimate and viability in contravention of Section 10(b) of the Exchange Act, and the dependent Section 20(a) claim brought

against the NovaGold Officers and the NovaGold Directors is

denied.

SO ORDERED:

Dated:     New York, New York
           June 5, 2009

_____
           DENISE COTE
United States District Judge

79